UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JAMES LOGAN BARTELL,<br><br>     Petitioner,<br><br>v.<br><br>KEITH YORDY,<br><br>     Respondent. | Case No. 1:17-cv-00282-CWD<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Petitioner James Logan Bartell's Petition for Writ of Habeas Corpus is now fully briefed and ripe for adjudication. (Dkts. 3, 27, 31, 34.) All parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkt. 13.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

The Court takes judicial notice of the record from Petitioner's state court proceedings, lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

Having carefully reviewed the record and considered the arguments of the parties, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

**REVIEW OF PETITION**

## 1.     Background

In a criminal action in the Seventh Judicial District Court in Bingham County,
Idaho, Petitioner was charged with two counts of lewd conduct with a child under the age
of sixteen. Petitioner, an adult male, lived with his parents, who regularly babysat
Petitioner's three- and five-year-old nieces, S.B. and N.B., while their mother was at
work or college. Each child accused Petitioner, their paternal uncle, of touching her
vagina or putting his finger in her vagina. These acts happened several times in 2012 with
N.B., but only once with S.B. When N.B. finally revealed these acts to her mother
because the last instance of abuse hurt, she was taken to the hospital for examination.
Police investigators were called, and Petitioner was charged and arrested.

Four different public defenders represented Petitioner during the course of his
criminal case. Attorney Cindy Campbell represented Petitioner for four months from the
first appearance on August 2, 2012, through the preliminary hearing stage. (State's
Lodgings A-1, p. 20; D-4, p. 7.) Petitioner requested a continuance of the preliminary
hearing, voicing his desire to hire a private attorney. (*Id*., p. 25.) Petitioner appeared in
court at the rescheduled preliminary hearing date with Campbell and waived the hearing;
he was bound over for arraignment. (*Id*., p. 31.) On September 10, 2012, Campbell
represented Petitioner at his arraignment. (*Id*., pp. 1-2.)

On October 4, 2012, attorney Jared Ricks was appointed to represent Petitioner.
(State's Lodging A-1, p. 47.) On October 26, 2012, Ricks informed the court that he had
"a conflict of interest in representation" because he had informed Petitioner that he was a

former prosecutor, and Petitioner objected to being represented by someone with that history. (*Id.*, pp. 49, 52.)

On October 29, 2012, attorney R. James "Jim" Archibald was appointed to represent Petitioner, just ahead of the trial scheduled for November 27, 2012. (*Id.*, p. 50.) On November 5, 2012, Archibald and Petitioner appeared at a pretrial conference. Archibald indicated that the defense intended to proceed to trial as scheduled. (*Id.*, p. 54.)

Archibald represented Petitioner at the jury trial. Petitioner was found guilty of both counts. (*Id.*, p. 112.) Archibald filed a motion for new trial based on the jury foreman's failure to disclose that he had a private business relationship with a prosecuting attorney who worked in the Bingham County Attorney's civil division. (*Id.*, pp. 120-124, 150-53.) The motion for a new trial was unsuccessful.

Thereafter, the Court ordered a psychosexual evaluation and replaced Petitioner's attorney with Stephen S. Hart, who represented him through sentencing. (State's Lodging A-1, pp. 55-56, 167-214.) The judgment of conviction was entered on April 8, 2013. (*Id.*, pp. 195-97.) Petitioner received a unified sentence of 20 years in prison with 8 years fixed. (*Id.*)

The state appellate public defender was appointed to represent Petitioner on direct appeal. (*Id.*, pp. 215-25.) Petitioner received no relief on direct appeal. (State's Lodgings B-6 to B-9.) He next pursued a state post-conviction petition. (State's Lodging C-1.) Attorney Deborah Whipple represented Petitioner on post-conviction appellate review.

Again, Petitioner received no relief, other than to obtain authorization to file a Rule 35 motion. (State's Lodgings C-1, pp. 210, 213; D-4 to D-8; E-4.)

Petitioner filed the Rule 35 motion for correction of sentence. Attorney Manuel Murdoch was appointed to represent him. The state district court issued an order denying the motion, and Petitioner did not file an appeal. (State's Lodgings E-1 and E-8.)

In the instant Petition for Writ of Habeas Corpus, Petitioner raised six claims of ineffective assistance of trial and appellate counsel. (*Id*. at 5-9.) Earlier in this matter, Respondent filed a Motion for Partial Summary Dismissal, asserting that Claims 2, 4, 5 (in part), and 6 were procedurally defaulted. (Dkt. 15.) Petitioner agreed, and the Court dismissed those claims. (Dkts. 21, 23.) Accordingly, the merits of Claims 1, 3, and 5 (remaining part) are now at issue. While Respondent newly asserts that some of the subparts of Claim 3 are procedurally defaulted, the Court finds it more efficient to address those claims on the merits de novo than to undertake the complex procedural default analysis.

## 2.      Standard of Law for Review of Petition

### A.      *AEDPA Deferential Review Standard*

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

1.     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). If fair minded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The United States Supreme Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).

However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

### B.     De Novo Review Standard

In some instances, AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate excuse for the procedural default of a claim exists. In such instances, the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). As in the pre-AEDPA era, a district court can draw from both United States Supreme Court and well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. To the contrary, if a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1) and the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### C.     Sixth Amendment Standard

The Sixth Amendment to the United States Constitution provides that a criminal defendant has a right to effective assistance of counsel in his defense. The standard for

such claims was defined in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel case. *Id.* at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. Further, counsel is not deficient in an area where an investigation would not have been fruitful for the defense.

The Ninth Circuit has provided some insight into the *Strickland* standard when evaluating an attorney's "strategy calls." These cases are instructive in the Court's assessment of whether the state court reasonably applied *Strickland*. *Duhaime*, 200 F.3d at 600. First, tactical decisions do not constitute ineffective assistance simply because, in retrospect, better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Second, a mere difference of opinion as to tactics does not

render counsel's assistance ineffective. *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).

If a petitioner shows that counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. 86 at 112.

The foregoing standard, giving deference to counsel's decision-making, is the de novo standard of review. Another layer of deference—to the state court decision—is

afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims

on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application
> of the *Strickland* standard was unreasonable. This is different
> from asking whether defense counsel's performance fell
> below *Strickland*'s standard. Were that the inquiry, the
> analysis would be no different than if, for example, this Court
> were adjudicating a *Strickland* claim on direct review of a
> criminal conviction in a United States district court. Under
> AEDPA, though, it is a necessary premise that the two
> questions are different. For purposes of § 2254(d)(1), "an
> unreasonable application of federal law is different from an
> incorrect application of federal law." *Williams*, *supra*, at 410,
> 120 S. Ct. 1495. A state court must be granted a deference
> and latitude that are not in operation when the case involves
> review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101.

That is, when evaluating a claim of ineffective assistance of counsel in a federal

habeas proceeding under § 2254(d), the Court's review of that claim is "doubly

deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

### 3.     Discussion

### A.  *Claim 1: Attorney Campbell's Representation*

Petitioner asserts that Campbell, who represented him from arraignment through

the preliminary hearing only, was ineffective in failing to communicate with him and

performing no investigation into his case. (Dkt. 3, pp. 12-14.) Petitioner makes various

factual allegations, which distill into the following sub claims: (a) Campbell did not

investigate or address Petitioner's mental disability/mental illness issues, including

whether a competency hearing should be held; (b) Campbell did not investigate or

address Petitioner's allegations that the victims previously had been molested by their maternal grandfather and uncle; (c) Campbell rarely communicated with Petitioner; and (d) Campbell did not propound any discovery, issue subpoenas, or submit witness lists.

### 1) Sub claim 1(a)

It is undisputed that Campbell did not have Petitioner examined or request a hearing to determine, in light of his history of mental disability and illness, whether he was competent to stand trial and to assist in his own defense. (*Id*., p. 14.) Petitioner asserts that he was receiving Social Security Disability Insurance (SSDI) payments from the government for a condition of mild mental retardation, but says that, as a minimally-competent criminal defense attorney, Campbell either knew it and did nothing about it, or should have discovered it. This Court considers whether the Idaho Court of Appeals' opinion in this case—concluding that these omissions did not constitute ineffective assistance of counsel—is an unreasonable application of *Strickland* under the AEDPA deferential review standard.

Petitioner raised this claim before the Idaho Court of Appeals in the post-conviction matter. The Idaho Court of Appeals rejected Petitioner's claim, finding: "Neither Bartell's petition nor the supporting affidavits allege that Bartell showed any signs or symptoms of being mentally ill or incompetent during the time Campbell represented him." (State's Lodgings D-4, p. 7; C-1, pp. 12-13, 30-31.) Further, the Idaho Court of Appeals found that Petitioner did *not* allege in his petition or supporting affidavit that Petitioner "ever informed Campbell of his mental health history" and

"nothing in the record … demonstrate[s] why Campbell should have known about Bartell's mental health history." (State's Lodgings D-4, pp. 708; C-1, pp. 12-13, 30-31.)

Finally, the Idaho Court of Appeals found that there was nothing in the entire record "to demonstrate why Campbell should have known about Bartell's mental health history, nor is there any evidence that Bartell would have been found incompetent had a competency evaluation been performed." (*Id*.) Because no information in the record showed that a mental health evaluation would have been appropriate or fruitful, Campbell was not ineffective in failing to investigate this avenue, the Idaho Court of Appeals concluded. (*Id*.)

Here, Petitioner must show that the Idaho Court of Appeals' decision was an unreasonable application of *Strickland*. Campbell's only representation of Petitioner was during the preliminary proceedings, encompassing the first few months of the criminal case. Petitioner argues that counsel should have visited the scene of the crime and interviewed family members to prepare for the preliminary hearing.

Respondent argues that it is not reasonable to have expected Campbell to do in-depth investigation at that point, citing *Barber v. Page*, 390 U.S. 719 (1968). However, the holding of that case was aimed at the right of confrontation of witnesses and did not address how thorough an investigation should be completed in the early months of a criminal representation. Where Idaho's speedy trial time frame is six months from the date of arrest, information, or arraignment, *see* I.C. § 19-3501, it is essential for defense attorneys to begin investigations fairly quickly. It seems that Campbell at least could

have asked Petitioner what he did for work, which would have revealed that he was on SSDI.

However, even if Campbell was deficient in her performance because she failed to do minimal investigative work, *Strickland* still requires Petitioner to show that the failure prejudiced his defense. This, Petitioner is unable to do.

As to the mental health condition, the record reflects that Petitioner testified in a manner that does not call in to question his competence. (State's Lodging A-2, pp. 305-15.) When testifying, Petitioner demonstrated an understanding of what he was accused of, how he viewed his relationship with the victims, and the wrongful nature of what he was accused of:

> I—I cared for them girls. They're almost like my own kids, I would say. I would never touch a little kid. These accusations are wrong. I don't know why they would be even saying this.

(State's Lodging A-2, p. 313.)

In addition, no mental health professional who interviewed or examined Petitioner found that he was incompetent or mentally deficient to the extent that Petitioner suggests.

On January 21, 2013, Blair Garner, LCSW/Certified Psychosexual Evaluator, conducted a psychosexual evaluation of Petitioner. (State's Lodging A-3, pp. 18-25.) It was determined from the Multiphasic Sex Inventory II that Petitioner's "sex knowledge and release scale … positively correlated with IQ and it appear[ed] that Mr. Bartell likely had at least average ability." (*Id*., p. 19.) Garner observed:

> Mr. Bartell was pleasant and cooperative throughout the course of the evaluation. His social interaction appears to be within normal limits, although he states he is on disability for mild mental retardation. He is oriented to all spheres.
>
> Memory appears to be intact and appropriate for both short and long term memory. Insight appears to be somewhat limited. No indication is noted in interaction with him that would suggest he suffers from any mental illness or thought disorder.

*Id.*, pp. 18-19.

On March 25, 2013, in preparation for Petitioner's sentencing, Steve Orme, LCSW, performed an Idaho Standard Mental Health Assessment on Petitioner. (State's Lodging A-3, p. 45.) Orme submitted the assessment results to the sentencing court.

In the Orme evaluation, Petitioner reported having been diagnosed with depression, bipolar disorder, and mild retardation. (*Id.*, p. 42.) He also reported that he had been on SSDI for mild retardation since he was 16. (*Id.*) Orme found there was no documentation in the record of Petitioner's reported issues. (*Id.*)

Orme concluded that Petitioner suffered from mild recurrent major depressive disorder. (*Id.*, p. 43.) Orme found that Petitioner's depression did not impact his functioning and was directly related to his current situation (awaiting sentencing for a crime). More particularly, Orme observed:

> After meeting with James he appears to understand the concepts of right and wrong. He understands the crimes he has been accused of and was able to give aid to his defense during the trial. If James does have mild retardation it appears to have little impact on him as he was able to engage in appropriate conversation during the assessment, he was able to describe his situation without trouble, he was able to

describe mental health symptoms, and he did not appear to
struggle with formulating his thoughts.

(State's Lodging A-3, p. 43.) Orme concluded that Petitioner had no social, family,

psychiatric, financial, or educational/vocational functional impairment due to his mental

health. (*Id*.)

Evaluator Trevor Sparrow, MS, conducted various tests on Petitioner in

conjunction with the psychosexual evaluation. Sparrow found that Petitioner's score on

the Cognitive Impairment Screen was in the range of no-to-minimal impairment at the

time of the evaluation. (*Id*., p. 35.) Sparrow took note that Petitioner had reported

attending special education classes or an alternative school program in his youth, but,

nevertheless, Sparrow "observed no indications of developmental disabilities and

minimal indications of cognitive impairment." (*Id*., p. 35.)

Petitioner raises the same complaints as many other defendants represented by

public defenders. The criminal justice system is overwhelmed by the number of

defendants needing publicly-funded counsel, and yet the adversary system is dependent

upon defendants having representation. In an effort to balance the needs of defendants for

counsel with the limited resources of the general public, the "ineffective assistance of

counsel" bar is set fairly low. Criminal defense lawyers must function at a "minimal level

of competence required by *Strickland*." *Cannedy v. Adams*, 706 F.3d 1148, 1168 (9th Cir.

2013).

Here, Petitioner asserts that, during the two months she represented him, Campbell

met with him only for ten to fifteen minutes before each of two hearings. She would not

accept his phone calls from the jail. Petitioner wanted Campbell to investigate whether his nieces were sexually abused by other male relatives. Petitioner also wanted Campbell to visit the scene of the crime.

This Court has independently reviewed the record. The Court agrees with Petitioner that, at a minimum, Campbell could have asked him a few questions about himself, which would have revealed the fact that he was on disability for mild mental retardation. However, even had counsel known that and investigated it further, it would not have been a fruitful endeavor.

Nothing in the state court record or this Court's record indicates that Petitioner is so impaired that a mental competency evaluation should have been requested or performed. Three independent master's level mental health professionals found that Petitioner could function appropriately, despite his assertions that he received disability payments for mild mental retardation and had been diagnosed with his several mental conditions. Therefore, no prejudice resulted from lack of investigation into Petitioner's mild mental retardation or mental health condition, from failure to request a mental health evaluation, or from lack of a competency hearing.

Accordingly, the Court concludes that the Idaho Court of Appeals' decision rejecting Petitioner's subclaim against Campbell for lack of a showing of deficient performance was not an unreasonable application of *Strickland*, nor was it an unreasonable determination of the facts. The record fully supports the decision that no

prejudice resulted from the alleged failures. The Court alternatively rejects Claim 1 on the merits under the de novo review standard for failure to show prejudice.

2) <u>Claim 1(b)</u>

Petitioner faults Campbell for failing to investigate or address with Petitioner his allegations that N.B. had been sexually molested by her maternal grandfather and S.B. had been sexually molested by her uncle. Petitioner did not raise this claim against pre-trial counsel Campbell in his appellate brief, but brought it against trial counsel, Jim Archibald. The Idaho Court of Appeals addressed this claim in the context of trial counsel Archibald's performance, not Petitioner's performance. However, the analysis on the issue is nearly the same. Therefore, any factual findings deserve deference.

The Idaho Court of Appeals first noted that the state district court presiding over the post-conviction matter properly applied the general rule in analyzing Petitioner's claim: "Where a defendant has been charged with a sex crime, evidence of a victim's past sexual behavior is generally inadmissible." Idaho R. Evid. 412(a). (State's Lodging D-4, p. 8; State's Lodging C-1, p. 172.) Two exceptions exist: when there is "evidence of past sexual behavior with persons other than the accused, offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, *the source of the injury*; or evidence of sexual behavior with parties other than the accused *which occurred at the time of the event* giving rise to the sex crime charged." (State's Lodging C-1, p. 172 (emphasis added.)

The state district court reasoned:

> The Complaint filed against Bartell alleged that the lewd or lascivious act or acts upon the victims, N.B. and S.B., took place on or between January 1, 2012, and June 25, 2012. The Officer Probable Cause Statement attached to the Complaint reveals that N.B., who was seven (7) years old, made an outcry to her mother that Bartell had unbuttoned her pants and put his hand "inside … a lot." N.B. told the investigating detective that she made the outcry the night before she was interviewed by the investigator." S.B. (N.B.'s five-year-old sister), in a separate interview, told the investigator that Bartell touched her vaginal area, inside her underwear "only one time."

> Bartell's father (Daniel Dean Bartell) and his mother (Robin Bartell), in their Declarations, stated that when N.B. was three (3) years old, she told them that her maternal grandfather took her to bed with him and made the act of sucking [the maternal grandfather's] penis a reward for good behavior. Daniel Dean Bartell's and Robin Bartell's knowledge of an alleged outcry by S.B. against her paternal uncle was hearsay, since the alleged outcry was not made in either Daniel Dean Bartell's presence or Robin Bartell's presence. Bartell offers no exception to the hearsay rule that would allow admission into evidence of Daniel Dean Bartell's or Robin Bartell's testimony.

> Given N.B.'s direct identification of Bartell as the perpetrator of sexual touching in the six months immediately preceding her outcry, and assuming the veracity of Daniel Dean Bartell's Declaration, the nature of the alleged incident with the material grandfather was markedly different than the outcry against Bartell. Even if Ms. Campbell had interviewed Daniel Dean Bartell and/or Robin Bartell and discovered the prior outcry, the fact that somebody else might have abused N.B. in a very different manner four years earlier was not a reasonable defense to N.B.'s allegations against Bartell. Such evidence would not have been admissible at trial.

*Id.*

Because a defendant is constitutionally entitled to present a defense, the Idaho Court of Appeals applied an additional two-part test to determine whether a defendant's Sixth Amendment rights were violated, in this case, by not permitting Petitioner to put on evidence that the victims may have been sexually abused two and four years earlier: (1) whether the evidence proffered is relevant; and (2) whether other legitimate interests outweigh the defendant's interest in presenting the evidence. (*Id.*, p. 9.)

Addressing Petitioner's criticism of the district court's decision that the evidence was inadmissible, the Idaho Court of Appeals concluded:

> Here, the district court ruled that the alleged prior-abuse evidence was inadmissible and therefore found that Archibald was objectively reasonable in not attempting to admit it. We agree, The facts presented at trial were that Bartell sexually assaulted N.B. when she was seven years old and sexually assaulted S.B. when she was five years old. N.B. testified that on multiple occasions Bartell put his finger inside her "pee-pee," which she identified as her vaginal area. S.B. testified that Bartell touched her on her "square," which she identified as her vaginal area. The victims both testified that the abuse occurred at the home of Bartell's parents. Bartell was the only person whom the victims identified as touching their vaginal areas.
>
> By contrast, the alleged abuse concerned distinguishable facts. Bartell supplied affidavits from his parents and brother (the victims' father) alleging that when N.B was three years old, her maternal grandfather had sexually abused her by coercing her to perform oral sex acts on him. There was no allegation that the maternal grandfather, or any other individual, touched N.B.'s vaginal area. These affidavits also stated that when S.B. was three years old, S.B.'s mother told Bartell's parents that S.B. had told her that her maternal uncle had touched S.B. However, the nature of this alleged touching was never clarified. Bartell's father conceded that S.B. "did not personally report

> this abuse by her [maternal uncle] to me and my wife."
> Moreover, the prior assaults would have predated the abuse
> for which Bartell was charged by approximately four years
> for N.B. and two years for S.B.

(State's Lodging D-4, pp. 9-10.)

In Petitioner's case, the children were very precise in their accusations. N.B., eight years old at the time of trial, testified that it was Petitioner who touched her genital area, that it occurred on the couch in her Grandma Robin's living room, during a time when Grandma and Grandpa went to their bedroom at the end of the hallway for something, and that no one else was in the house.

N.B. testified that she was lying down on the floor coloring, when Petitioner called her up onto the couch. She got on the couch and began coloring again. She then returned to the floor to color. Petitioner called her to the couch a second time. She obeyed. Then Petitioner used his finger to touch the inside of her "pee-pee," inside her underwear. She remembers that he did not do anything with his finger when he put it inside her "pee-pee," and that the touching lasted a short time. She remembers that she was wearing pants at the time. It happened more than once on different days in the middle of her first-grade school year. The touching made her feel uncomfortable, but it did not hurt until the last time he did it, because that time "he did it harder on the sides." Petitioner did not say anything to N.B. about the touching or during the act, and N.B. did not say anything to Petitioner. The last time Petitioner touched her was the same day she went to the doctor to be examined regarding the touching. (State's Lodging A-2, pp. 188-210.)

S.B. was six years old at the time of trial, but five years old when the crime occurred. She testified that Grandma and Grandpa were in bed in the afternoon, and she and Petitioner were watching *Tangled*. Petitioner was seated next to S.B. when he reached inside her pants and touched her genital area on the outside of her underwear.[1] She recalled that it made her feel "mad." (State's Lodging A-2, pp. 222-40.)

The record supports the appellate court's reasoning—that the alleged prior touching of the victims by other adult male relatives was not relevant to the claims against Petitioner. Beyond the hearsay problems, the Court agrees that the other alleged incidents should not have been admitted under the exceptions to Idaho Rule of Evidence 412(a) because they were not similar in type or close in time. N.B.'s prior allegations against her grandfather involved oral sex only; the allegations against Petitioner involved manual-genital contact only. The reports of S.B.'s allegations against her paternal uncle are too vague to be relevant.

Petitioner is implying that the maternal grandfather and uncle could have continued to sexually molest the girls, and they mistakenly identified Petitioner as the perpetrator of the crime. But Petitioner has provided nothing in the years since his conviction to show that these other male relatives had been alone with the children during the time period in question. N.B. testified at trial that she never went to her maternal grandfather's or maternal uncle's houses alone, but was always accompanied by her mother or her mother's boyfriend, John. (*Id.*, p. 218.)

---

[1] S.B. told the investigating officer Petitioner touched her inside her underwear. See State's Lodging A-1.

Petitioner has not brought forward any evidence to challenge the victims' memories, their intellect, or their skills in distinguishing among their male relatives. The children separately readily reported the unrelated sexual abuse two and four years earlier. They did not report any sexual abuse over the past two and four years, respectively. They reported abuse again when it occurred again, but with a different perpetrator.

Petitioner has not shown that the prior sexual abuse allegations should have been admitted into evidence. Therefore, even if this Court found that Campbell was deficient in failing to undertake an adequate investigation into the prior allegations early in the case, Petitioner's defense suffered no prejudice. Therefore, Campbell was not ineffective, and Petitioner's claim is subject to denial.

Petitioner also argues that he should have been able to present the allegations of the other sexual molestations *to rebut the testimony of the examining doctor*, Thomas Gelwix, M.D. In his trial testimony, Dr. Gelwix admitted he had no specialized training regarding sexual assault other than his on-the-job training, and that he has seen several cases a year for 15 or 16 years. (State's Lodging A-2, pp. 250-52.) On June 25, 2012, Dr. Gelwix testified that he examined N.B. relative to an alleged sexual assault. He testified that N.B. had an enlarged hymenal opening and mild redness ("erythema") in that region, and those conditions "potentially" could have been caused by abuse or "possibly" caused by abuse. (State's Lodging A-2, pp. 250-64.)

Petitioner could *not* have rebutted Dr. Gelwix's testimony with allegations that N.B.'s grandfather made the child perform oral sex on the grandfather four years earlier,

because the occurrence of an enlarged hymen and erythematous vagina in 2012 could not have been caused by performing oral sex on an adult in 2008. Dr. Gelwix did not examine S.B., and so the unspecified allegations of sexual abuse by a different uncle in 2010 could not have been used to rebut Dr. Gelwix's testimony.

No evidence of contemporaneous contact with the other men is in the record. If any witness had information of contemporaneous or close-in-time contact with prior molesters, Petitioner and his relatives would have discovered it by now. But there is a large blank spot in the record between the prior molestations and the ones in which Petitioner was charged. As a result, nothing in the record reflects that Petitioner should have been permitted to introduce the prior sexual abuse as rebuttal to Dr. Gelwix's testimony.

The Court rejects de novo this ineffective assistance of counsel claim against Campbell for failure to show prejudice. This claim will be denied with prejudice.

### 3) Claim 1(c)

Petitioner also alleges that Campbell rarely communicated with him. However, Petitioner has not specifically identified how the outcome of the pretrial phase or the entire case could have been different had Campbell done more investigatory work. As discussed above, had Petitioner investigated the mental health issues or the prior molestations, the investigations would not have been fruitful. Therefore, this sub claim will be denied for failure to show prejudice under the de novo review standard.

4) <u>Claim 1(d)</u>

Petitioner likewise complains that Campbell did not propound any discovery, issue subpoenas, or submit witness lists. Campbell did not visit the crime scene or have in-depth discussions with family members about Petitioner's mental issues or trial strategy. (Dkt. 3, pp.12-13.) While the Court agrees that, in the first 120 days of the case, the attorney probably could have done more to investigate the case, Petitioner does not allege any specific prejudice that arose from not having done more. He has not stated why a visit to the crime scene was critical, what other evidence should have been unearthed, or which witnesses should have been subpoenaed. Thus, he has failed the second prong of *Strickland*. This sub claim is subject to denial under the de novo review standard.

**B.    *Claim 3: Attorney Archibald's Performance***

Jim Archibald was substituted as counsel for Petitioner about one month before trial. Archibald handled all proceedings from the pretrial conference to a post-conviction motion for a new trial.

1) <u>Claim 3(a)</u>

Petitioner alleges that Archibald was ineffective for "failing to obtain a competency evaluation or request a competency hearing." (Dkt. 3, p. 12.) This claim fails for the same reason Claim 1 against Campbell fails. As against Archibald, Petitioner particularly alleges that Archibald knew there was ample information regarding [Petitioner's] history of having been on disability since he was sixteen," but Petitioner does not show how or why Archibald would have had reason to suspect that Petitioner

was so impaired that he was incompetent, because Petitioner was able to assist in his defense and otherwise functioned appropriately. His testimony reflects that.

As with Campbell, the record reflects that no prejudice occurred for Archibald's failure to do further investigation into the competency issue or request that a competency hearing be held. A competency evaluation would not have been different from the three expert opinions discussed above. Therefore, neither deficient performance nor prejudice has been shown.

### 2)  Claim 3(b)

Petitioner further asserts that Archibald should have retained a defense expert to rebut the testimony of Dr. Gelwix, who examined N.B. However, Petitioner has not provided an affidavit or any information showing that a doctor would have been willing to testify for him and that the doctor's opinion would have been different from the treating doctor's opinion—that the enlarged, erythematous vagina could *not* potentially or possibly have been caused by recent sexual abuse by Petitioner.

In fact, Dr. Gelwix's testimony was so equivocal, Archibald did not need his own expert. Archibald drew testimony from witnesses that N.B. often rode a bike that was too big for her and sometimes crashed while riding it. Archibald then argued in closing:

> Does the doctor rule out other causes? I don't think he does. I heard him say yesterday it could be other causes. I didn't hear him rule out a bicycle….And then what does the doctor conclude after hearing the same evidence that you did? Alleged assault. Maybe it happened; maybe it didn't. And so if maybe it happened and maybe it didn't—the tie goes to Mr. Bartell every time.

(State's Lodging A-2, p. 349.)

There being no prejudice that Petitioner has shown resulting from the absence of his own expert, this claim fails on the second prong of *Strickland* and will be denied de novo.

### 3) Claim 3(c)

Petitioner claims that Archibald was ineffective for presenting and then abandoning in the midst of trial the defense that the allegations of abuse were connected with the victims' parents' divorce. Archibald seemed to have an evolving theory of defense that followed the evidence at trial.

Archibald's opening statement included the following:

> Children this age—of course, they're susceptible. James, my client, is going to tell you that his brother and the mother of these children are just starting up a divorce that— then these allegations were made against him, and then the divorce was granted. The divorce was filed between his brother and the mother of these children in May of 2012. These allegations came up in June of 2012. And then the divorce was granted in July of 2012.

(State's Lodging A-2, p. 157.)

However, at trial, it was revealed that the children's parents had been separated for about five years, and there was no animosity between them in finally drawing up and finalizing the divorce paperwork. The mother still relied on her soon-to-be ex-husband's parents to babysit the girls while she worked part-time and attended college. In short, there was no evidence that the mother had any motive to make up the allegations against Petitioner to try to gain leverage in a stipulated divorce.

In an in-chambers attorney meeting in the midst of the trial, Archibald announced to the prosecutor and the judge that he was going to change gears and focus on June 2012, because he had two witnesses who would confirm that Petitioner was never alone with the children in June 2012. (*Id*., p. 273.) However, the prosecutor objected to Archibald's sudden revelation that he was going to call the children's grandmother as a witness, because the judge had announced the exclusion of witnesses rule at the beginning of the trial, and the grandmother had sat through the entire trial to date. The judge agreed and ruled that Archibald was prohibited from calling the grandmother as a witness. Petitioner asserts that the only witnesses who could testify that he was never alone with the children were thus precluded from testifying—another large problem that a small investigation would have prevented. (*Id*., pp. 273-82.)

After the jury heard all of the evidence, Archibald argued in closing that the children's testimony just did not make sense—that a grown man who was not masturbating, not engaging in pornography, and not drinking would sexually assault the children in the middle of the day, with his parents in the house. Archibald argued that because the girls believed in the Easter Bunny and Santa Claus, they were easily led by adults to believe things that were not true. (*Id*., pp. 344-51.)

This change in strategy did not go unnoticed. On rebuttal, the prosecutor stated:

> If you remember Mr. Archibald's opening, his statement to you was that these are false allegations that are the result of a contested divorce proceeding.
>
> And you didn't hear that. In fact, you heard exactly the opposite of that. The parents have been split up for a long

time. Mom prepared the paperwork. Dad agreed to it, sign off, done, in a very short period of time.

So that didn't materialize for him.

So, now we've changed the story.

Instruction 8, reasonable doubt is a doubt based on reason and common sense. And there's not a doubt here for which anything makes sense. There's—there's no doubt he can raise that makes more sense than the truth that you've heard.

(State's Lodging A-2, p. 352.)

This Court agrees with Petitioner that, if Archibald's trial defense was going to be that the children's mother made up the sexual assault allegations to gain leverage in a divorce proceeding, he first was obligated to investigate the facts. "[C]ounsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, No. 14-17366, slip op. at 13 (9th Cir. April 21, 2017) ("Weeden's counsel could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal.").

Archibald could have spoken to friend and relatives of the couple or possibly obtained this information from Petitioner himself. He could have obtained a copy of the divorce proceedings, or at least a copy of the register of actions or docket in the divorce case. Even the slightest bit of investigatory work would have revealed that there was no evidence to support that theory. Therefore, the Court concludes, de novo, that Archibald rendered deficient performance in failing to investigate, thereby selecting a defense strategy that had no basis in fact.

The second question under *Strickland* is whether Petitioner was prejudiced by Archibald's failure to investigate the divorce leverage motive theory. The Court must first dispense with Petitioner's overwhelming desire to blame the men on the other side of the family for the misdeeds against these children. There is no admissible evidence tying the acts at issue to the other men. The only evidence was in the form of inadmissible hearsay. The evidence was not relevant because it was not similar or timely, and, therefore, Petitioner could not have gained its admissibility by arguing that his Sixth Amendment right to put forward the defense of his choice was violated.

Dispensing with Petitioner's alternative blame theory, the Court also concludes that a trial strategy relying on mental incapacity to negate *mens rea* would not have been possible, based upon the evidence discussed above. What, then, would have been a defense theory that reasonably could have affected the outcome of the case? Petitioner does not suggest any viable theory. His theory that he was never alone with the children—discussed in detail directly below as Claim 3(d)—was unprovable. The testimony of the victims was strong and solid. Their testimony demonstrated that they were old enough to know truth from falsity. They were wise enough to be mindful of what was happening to them and to report it with accuracy to trusted individuals. The trial itself was short and to-the-point.

The sentencing judge, who had the opportunity to observe the demeanor of Petitioner and the victims as they testified at trial concluded:

> I listened to the evidence, and it was clear to me that
> these girls knew what they were talking about in a manner

> that was consistent with their age. And I'm convinced beyond
> a reasonable doubt that the crimes were committed by you. I
> say that based on my observation of the witnesses that
> testified and the evidence that I saw in this courtroom.

(State's Lodging A-2, p. 418-19.)

Therefore, while Petitioner is understandably frustrated by Archibald's performance, no prejudice resulted from choosing one mediocre defense theory over another, simply because *no* good theories existed on this set of facts. The defense attorney's job is to work with the facts he has, not make up new facts to aid the defendant (which would have been an ethical violation). Archibald had a bad set of facts to begin with. Because no prejudice is shown from the complete record, this claim will be denied on the merits on de novo review.

### 4)  Claim 3(d)

Petitioner asserts that Archibald failed to present evidence that he had never been alone with N.B. and S.B. However, even the affidavits of the girls' grandparents (Petitioner's parents) only *imply* that they were with Petitioner all the time—"James Bartell was never alone with N.B. and S.B. in my home in June of 2012." (State's Lodging C-1, p. 40.) The grandparents have not addressed plainly the real issue of whether they ever left the room where Petitioner and the girls were. Both grandparents were disabled, and they never addressed the girls' testimony that they would go into their bedroom and lie down or take a nap in the afternoon, while Petitioner remained in the living room with the girls. The prosecutor made the common-sense argument that "[i]t "doesn't take very long—a couple of minutes, maybe. They don't have to be gone long to

do anything. Grandma takes a shower. Grandpa is late getting out of bed. They go lay down for a nap." (State's Lodging A-2, p. 343.)

Even the girls' father, who was living with his parents for a few months during that time period could not offer supporting testimony, as this colloquy between him and the prosecutor shows:

> Q.   And it sounds like you were working long days building that beer garden and working on the apartments?
>
> A.   Yeah.
>
> Q.   So – and James is living at your mom and dad's too?
>
> A.   Yes.
>
> Q.   Okay. And so you don't know what's going on when you're gone, right?
>
> A.   No.
>
> Q.   You can't see everybody?
>
> A.   No. So….
>
> Q.   You're not Superman. You don't have x-ray vision?
>
> A.   No.
>
> Q.   All right. And, in fact, you don't know if anybody ever took a nap while you were gone, do you?
>
> A.   I can't say that for sure, no.

(*Id.*, pp. 302-03.)

Further, even if Petitioner *could* have called the grandparents to the stand to testify that they never left the living room while the girls were being babysat, their credibility would have been measured against the girls'—who said the grandparents left the living

room to go to their room or take a nap. It would have been difficult for any couple to testify that they both never left the room at the same time, and much harder for a jury to believe that over the more reasonable and logical testimony of the children.

As Petitioner explained during this cross-examination colloquy, the grandparents (Petitioner's parents) had ample reason to lie down in their room:

> Q. Do their disabilities require them to go lay down in the middle of the day?
>
> A. I wouldn't say that I would just – well, my mom's got a bad neck. My dad's got neck fusions. So to rest their bones, I guess, you could say yes to that.

(*Id.*, p. 312.)

Petitioner's testimony aligned with the victims'—that he would have had opportunity to sexually assault them when the grandparents were resting in their room to "rest their bones." Had the grandparents testified otherwise, their credibility would have been questioned by the jury. The Court concludes that no prejudice resulted from failing to call anyone to testify that other adults were always home at the time of sexual assaults. This sub claim will be denied on the merits de novo.

### 5) Claim 3(e)

Archibald filed a motion for a new trial on December 11, 2012, based on jury foreman Stewart's relationship as a plane mechanic to an attorney who worked in the civil division of the prosecutor's office. (State's Lodging A-1, p. 120.) Petitioner asserts that Archibald did not support the motion for a new trial with the necessary affidavits or other evidence. Archibald explained at the first hearing on the motion that, because the

conflict involved someone from the prosecutor's own office, he was waiting to see if there was a need to subpoena the juror or if there was not going to be a factual dispute. (State's Lodging A-2, p. 375.)

In response to the motion, the prosecution provided no facts about the relationship, but observed:

> The defendant has likewise produced nothing to suggest that Mr. Stewart in any way influenced the jury, or that he even thought about or considered his relationship with Mr. Cornelison while sitting on the case. Mr. Cornelison was not the one prosecuting the case and in fact never appeared in the courtroom. This is simply no reason to believe that there was anything untoward which took place in the jury room.

(State's Lodging A-1, p. 142.)

The prosecutor argued that the statute governing requests for new trials, I.C. § 19-2020, did not explicitly or implicitly cover a mechanic/customer relationship as a reason for implied bias. (*Id.*, pp. 142-43.) The prosecution also argued that case law existed that governed this situation: "In *State v. Buhanda-Velasquez*, 129 Idaho 726, 932 P.2d 354 (1997), the court considered a cases where the trial court had refused to dismiss an[] indictment because one of the grand jurors had contacts with a deputy prosecutor, who was not involved with the case. The court held there was no due process violation." (*Id.*, p. 143.)

Archibald filed a brief in support of the motion for new trial on January 30, 2013. Archibald did not subpoena or interview Mr. Stewart to determine whether there were any additional factual grounds to include in his motion. (State's Lodging A-1, pp. 150-

53.) Neither did Archibald interview Mr. Cornelison of the prosecutor's office or ask the

prosecutor to divulge more information.

The state district court entered an order denying the motion for a new trial:

> At oral argument, Bartell conceded his belief that
> Stewart's failure to reveal a business relationship with an
> attorney who worked in the Bingham County Prosecutor's
> office, but who had no participation or appearance in Bartell's
> trial, was not intentional. Furthermore, the precise nature of
> Stewart's relationship to Cornelison is not in the record.
> Bartell alleges an employer/employee relationship. While the
> State appears to assume a relationship of some sort between
> Stewart and Cornelison, and conceded at oral argument that
> Stewart has, on occasion, worked on Cornelison's airplane,
> the record does not support a finding of an employer/
> employee, debtor/creditor, or any other particular sort of
> congress between the two men. The record does not disclose
> whether the dealings between Cornelison are ongoing,
> concluded, expected, or otherwise.

(State's Lodging A-1, p. 164.)

Regardless, the state district court concluded that the "record does not support a

valid basis for a challenge for cause." (*Id*.)  That court reasoned:

> A challenge for cause may be granted where "the
> existence of a state of mind on the part of the juror in
> reference to the case, or to either of the parties, which, in the
> exercise of a sound discretion on the part of the tier, leads to
> the inference that he will not act with entire impartiality.
> Stewart's voir dire responses tend to a much greater degree
> toward an inference that he would act with impartiality in
> deciding upon the verdict. Stewart stated he believed he could
> sit as a fair and impartial juror. More telling, however, is
> Stewart's description of prior jury service on a criminal child
> abuse trial in which the jury found "for the defendant." While
> this Court cannot assume what lies within the heart of [sic]
> mind of any venire person, the Court may rely upon his or her
> assurances concerning partiality or bias. Not only Stewart's

> assurance, but also his prior jury service, inferred that could
> be [sic] an impartial juror on a case involving alleged Lewd
> Conduct with a Minor Under Sixteen. For these reasons, even
> if an implied bias was demonstrated, which it was not, Bartell
> has not shown a valid basis for a challenge for cause against
> Stewart.

(State's Lodging A-1, pp. 164-65.)

Clearly, the factual holes in the record could have been filled ahead of time had Archibald done an investigation. He could have interviewed Cornelison and Stewart. If they were not willing to speak to him, he could have subpoenaed them for deposition or for appearance at a hearing. It would not have been very difficult to send a set of informal interrogatories to the prosecutor requesting that the office reveal the details of the relationship between Cornelison and Stewart, since Cornelison was employed by the prosecutor. The Court concludes that Archibald acted deficiently in his duties to provide support for the motion for new trial.

However, in all the years since Petitioner has learned of the relationship of the civil attorney in the prosecutor's office and the jury foreman, he has not uncovered any fact that would cause this Court to question the factual findings and conclusions of the state district court. Nothing shows that Cornelison interfered with the trial in any way, and nothing shows that Stewart conducted himself different as jury foreman because of the mechanic-owner relationship they shared. Because Petitioner has not shown any prejudice, this claim will be denied on de novo review.

6) Claim 3(f)

Petitioner asserts that Archibald should have presented evidence that N.B. and S.B. were abused by their maternal grandfather and uncle. Archibald did not speak to Petitioner's parents about these allegations until the day of trial. As discussed above, no prejudice resulted from this omission, because the evidence would not have been admitted. Therefore, Archibald was not ineffective. This sub claim will be dismissed under the de novo standard of review.

7) Claim 3(g)

Petitioner generally alleges that Archibald was deficient in his trial preparation. Archibald did not ask for a trial continuance, even though he was appointed only about one month prior to trial, and the prior attorneys had not conducted an in-depth investigation. Archibald rarely met with Petitioner and did not accept his phone calls from the jail. Archibald did not investigate known and identifiable witnesses regarding Petitioner's preferred theory of defense—that "someone else did it." Archibald did not call the victims' grandfather or maternal uncle to confront them about the allegations, nor did he subpoena law enforcement records of allegations of sexual abuse regarding the grandfather.

As discussed above, the Court concludes that Archibald's trial preparation was deficient. However, also as discussed above, Petitioner has failed to show that any prejudice resulted from the deficiency. Accordingly, because both prongs of *Strickland* must be satisfied, this claim is subject to denial under the de novo review standard.

### C.    *Claim 5: All Attorneys*

Petitioner asserts that the performance of all of his attorneys, individually and in combination, amounted to ineffective assistance of counsel. However, Petitioner has conceded that his claim of "collective" ineffective assistance is procedurally defaulted. The only claims left are those sub claims asserting that Campbell and Archibald were individually ineffective. The Court agrees that the remaining claims duplicate Claims 1 and 3 above, and that, for the same reasons, these sub claims warrant dismissal with prejudice under either the deferential or the de novo review standard.

## ORDER

**IT IS ORDERED:**

1. Respondent's Motion for Extension of Time to File Sur-reply (Dkt. 33) is GRANTED. The filing at Docket 34 is deemed timely.

2. The Petition for Writ of Habeas Corpus (Dkt. 3) is DENIED and DISMISSED with prejudice in its entirety.

3. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.



DATED: September 26, 2019

Honorable Candy W. Dale
United States Magistrate Judge